OPINION OF THE COURT
Robert Hettleman, J.
For the reasons stated below, I find that the petitioner has proved by a preponderance of the evidence that the respondent father, Gene M., neglected his children as alleged in the petition.
I. Procedural History
The Administration for Children’s Services (ACS) filed this neglect petition on May 15, 2013, alleging that respondents Ms. H. and Gene M. neglected the five subject children. Ms. H. and Mr. M. are the parents of the four oldest children, and the petition alleges that Mr. M. is a person legally responsible for the youngest child, a UA-year-old boy, in that Mr. M. lived in the home with Ms. H. and all of the children since the youngest child’s birth and undertook the role of parent to all of the children. The petition alleges that: (1) Mr. M. has an extensive history of mental illness, including a diagnosis of schizophrenia; (2) he previously had been found neglectful of the four oldest children in Kings County Family Court due to his mental illness and drug use; (3) he previously had been ordered by the Family Court to participate fully in mental health treatment but failed to do so; (4) he regularly used marijuana but was not enrolled in any treatment program; (5) he regularly hit Ms. H. in front of the children, causing the children to be afraid of him; and (6) he failed to provide the three oldest children with adequate guardianship and education, in that the oldest two each missed over 40 days of school in the 2012-2013 school year and that the third child, a five-year-old autistic boy, was not enrolled in any school, program, or treatment of any kind.
Mr. M. never appeared in response to this petition, but he was personally served with it. On September 9, 2013, this court *517 found service complete and joined the issue, and fact-finding proceeded in his absence.
The Fact-Finding Trial
On February 28, 2014, the fact-finding trial began. ACS called as a witness Child Protective Specialist Edward Santos, and the Attorney for the Child cross-examined him. Mr. Santos testified that he was assigned this investigation on January 11, 2013, after receiving an oral report transmittal (ORT) called in by a Department of Social Services worker. Mr. Santos then received two subsequent ORTs for the family: one on February 15, 2013, called in by Gouverneur Health; and one on March 15, 2013, called in by Bronx-Lebanon Hospital Center. ACS offered the three ORTs into evidence, and they were received without objection. The January 11th ORT described an incident from that day where Mr. M. and Ms. H. argued violently in front of at least one of the children, including Mr. M. threatening to punch Ms. H. in the face. The February 15th ORT described Mr. M. being removed from the family home on that date due to noncompliance with a mental health court order, as well as Ms. H. having injuries to her face. The March 15th ORT described, as told by Mr. M. himself, a February 25th incident where Mr. M. slapped Ms. H. in the face after a heated argument, all in front of the subject children.
Mr. Santos further testified that on May 13, 2013, he interviewed the two oldest children — ages 10 and 8 — separately and without anyone else present. The 10 year old disclosed that on multiple occasions in the past, he and his siblings observed Mr. M. punch Ms. H. in the face with his fists, and that this made the 10 year old feel afraid and confused. The child further stated that the children did not intervene during these incidents because they did not know what to do to help and because their parents are bigger than they are. The child also described that Ms. H. and the children had recently obtained an emergency housing transfer and relocated to a new address because of the domestic violence perpetrated by Mr. M., and that he knew that an order of protection had been issued protecting the mother and her children from Mr. M.
The eight year old informed Mr. Santos that he, too, had seen Mr. M. punch Ms. H. in the face with his fists and had observed multiple incidents of both of his parents fighting. This child also stated that the fighting made him feel bad and confused because he did not understand why his father was hitting his mother. It also made him feel nervous and afraid.
*518 Mr. Santos further testified that on March 20, 2013, he interviewed Mr. M. in the psychiatric ward of Bronx-Lebanon Hospital, where Mr. M. had been admitted for psychiatric treatment. When asked about the existence of the order of protection against him, Mr. M. responded, “What Order of Protection?” Mr. M. went on to say that the order of protection he had seen was “not real,” that it was signed only by a court clerk rather than by a judge, and thus that he did not care about it. When asked about why he was hospitalized in a psychiatric facility, Mr. M. responded incoherently, eventually stating, in substance, that the “system” was made to pit Blacks and Latinos against each other. When Mr. Santos informed him of the current ACS investigation, Mr. M. “lost his composure” and “got violent,” whereupon hospital staff had to remove Mr. M. from the room.
ACS also offered into evidence, without objection, two sets of mental health and treatment records for Mr. M. from Bronx-Lebanon Hospital. Those records detail a history of Mr. M.’s significant and chronic mental illness, including diagnoses of schizophrenia, prescriptions for medication, therapy, and treatment, and discharge recommendations for him. Additionally, they include statements made by Mr. M. about using marijuana on a regular basis since he was 18 years old, specifically using it as little as four times per month and more recently using it daily. Further, Mr. M. tested positive for marijuana upon admission at the second hospitalization.
Finally, ACS offered into evidence, without objection, an order of fact-finding and disposition from Family Court in Kings County, dated February 1, 2011, finding Mr. M. neglectful of the same five children due to his “ suffer [ing] from serious mental illness and fail[ure] to participate in appropriate treatment, putting the subject children at risk.” The Family Court ordered Mr. M. to, among other things, “continue to participate fully in prescribed mental health treatment including medication and counseling.”
II. Findings of Fact and Conclusions of Law
As an initial matter, I draw a strong negative inference from Mr. M.’s failure to testify in this matter. (See Matter of Nicole H., 12 AD3d 182 [1st Dept 2004].) Next, I find the testimony of Mr. Santos to be credible, straightforward, and sensible. Further, the petitioner has proved by a preponderance of the evidence that Mr. M. is a person legally responsible for the youngest child and that Mr. M. neglected the children.
*519 A. Neglect by Domestic Violence in Front of the Children
Mr. Santos’ recounting of the out-of-court statements of the two oldest children established that, on multiple occasions, Mr. M. punched Ms. H. in the face and physically fought with her in front of the children. This made the children upset, scared, and confused, and it drove the family to relocate from their home out of safety concerns. The children’s out-of-court statements are each corroborated by (1) the out-of-court statements of the other child (see e.g. Matter of Nicole V., 71 NY2d 112 [1987]; Matter of Anahys V. [John V.], 68 AD3d 485 [1st Dept 2009]); (2) the statements in the ORTs admitted into evidence (see Matter of Aaliyah Q., 55 AD3d 969 [3d Dept 2008] [ORT can corroborate out-of-court statements]; Family Ct Act § 1046 [a] [vi] [children’s out-of-court statements can be corroborated by any other evidence tending to support their reliability, including the other types of evidence described in this subdivision]); and (3) the respondent’s own statements at the hospital. Notably, the out-of-court statements of the children are consistent with one another and with the other evidence presented in the case. (See Nicole V., 71 NY2d at 124; Anahys V., 68 AD3d at 486; Matter of Tristan R., 63 AD3d 1075 [2d Dept 2009].)
In addition, Mr. M.’s statements to Mr. Santos on March 20, 2013 further demonstrate Mr. M’s failure to respect or follow the Family Court’s order of protection. Taken in the context of this case, they show either an intentional disregard of that order, or at least a significant indication that the respondent did not recognize the order’s importance, as well as the respondent’s failure to appreciate the detriment that his abusive actions were having on the subject children and the family as a whole.
The Family Court Act defines a “neglected child” as a child, less than 18 years old, “whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his or her parent or other person legally responsible for his [or her] care to exercise a minimum degree of care.” (Family Ct Act § 1012 [f] [i].) Family Court Act § 1012 (f) (i) requires the court to determine whether there is proof of actual or imminent danger of physical, emotional or mental impairment to the child before rendering a finding of neglect. (Matter of Jayvien E. [Marisol T.], 70 AD3d 430 [1st Dept 2010].) A finding of neglect does not require actual injury but, rather, an imminent threat that such injury or impairment may result. (Matter of Aiden L., 47 AD3d 1089 [3d Dept 2008].) It is well established that domestic *520 violence in the presence of subject children can constitute neglect under article 10 (see e.g. Matter of Edward C.L., 292 AD2d 282 [1st Dept 2002]), as such conduct constitutes “acts of a similarly serious nature requiring the aid of the court” under Family Court Act § 1012 (f) (i) (B). Viewing the evidence in total in the case at bar, the petitioner has proved the allegations of neglect by a preponderance in that Mr. M.’s repeated acts of domestic violence in front of the subject children had a direct and demonstrable harmful effect on them.
B. Neglect by Substantial, Untreated Mental Illness
The second set of allegations, relating to Mr. M.’s mental health problems and failure to get treatment, are also proved by a preponderance of the evidence.
As an initial matter, the testimony of Mr. Santos described that on March 20, 2013 the respondent was mentally unstable, seemingly unaware of his surroundings and the nature of what was going on both inside and outside of the hospital, inappropriately aggressive, and potentially violent. Next, the prior fact-finding and dispositional order, from Kings County Family Court on February 1, 2011, also documents Mr. M.’s chronic mental illness and the Family Court’s requirement that he participate in treatment and/or medication for his condition. (See Family Ct Act § 1046 [a] [i]; Matter of Devante S., 51 AD3d 482 [1st Dept 2008] [trial court can consider prior neglect finding as well as respondent’s failure to comply with prior recommendations].)
Further, petitioner’s exhibits 4 and 5, mental health records for Mr. M. from Bronx-Lebanon Hospital from February 14, 2011 to July 23, 2013, establish Mr. M.’s chronic and severe mental illness as well as his failure to try to meaningfully manage it. For example, at intake to the hospital on November 21, 2012, Mr. M. stated that he has not had any emotional problem or mental illness, but rather that he was there because Ms. H. filed a false report to the authorities to get him out of the home. The intake staff noted that Mr. M. became “guarded, manipulative, and restless when he was asked about his past psychiatric [history]” and that he stated that he never took his prescribed psychotropic medication nor followed up with prescribed psychiatric treatment because he thought he was “perfectly fine.” Mr. M. further admitted to marijuana use since the age of 18. On December 4, 2012, the hospital continued to diagnose Mr. M. with “Schizophrenia, Paranoid Type” and noted that he remained “internally preoccupied” and in need of “further *521 inpatient hospitalization for stabilization of his psychiatric symptoms.” The records go on to state that Mr. M.’s “recovery depends upon the use and regulation of a specific modality of treatment such as medications. However, the patient lacks motivation, refuses to cooperate, or would be unable to cooperate with the treatment plan” at a less restrictive level. Notes from December 11, 2012 state that while Mr. M. denied using any illegal substances, his urine screen from admission was positive for cannabinoids. On February 15, 2013, Mr. M. “got agitated, threatening the staff,” requiring forced medication and restraints. He remained diagnosed with “Chronic schizophrenia,” and hospital employees repeatedly noted his “poor insight” and “severely impaired” judgment. And even during the hospitalization, Mr. M. “continues to refused [sic] meds . . . on and off.” All of these records support a finding of neglect.
There are portions of the submitted records, however, that warrant further scrutiny as to their admissibility. Numerous statements in the records highlighted by ACS for consideration seem to come from outside sources that may not fall within the traditional medical record exception to the hearsay rule. For example, there are repeated triage and intake notes that state, in substance, that the respondent was brought to the hospital “after girlfriend called 911 [on account of] patient’s bizarre/ paranoid behavior.” The records also detail hospital staff’s conversations with both Ms. H. and with Mr. M.’s own mother, each describing his past history of mental illness, domestic violence, and failure to take his medication. Finally, the records make mention of conversations between hospital staff and outside treatment programs (assisted outpatient programs or AOTs), where the program workers inform the hospital that Mr. M. was not compliant with his prescribed medication regimen.
Traditionally, statements made by a patient that are germane to medical treatment are considered to be exceptions to the hearsay rule and therefore admissible for their truth. (People v Ortega, 15 NY3d 610 [2010]; Williams v Alexander, 309 NY 283 [1955].) And while New York State courts (and other states as well) have further liberalized this exception in recent years to include statements made for the purpose of mental health and social work treatment (see e.g. Ortega, 15 NY3d at 617; People v Duhs, 16 NY3d 405 [2011] [holding the same and also that admission of such statements in a criminal case does not violate the 6th Amendment right to cross-examination]), it remains an open question as to whether statements made by a third party *522 can fall within this exception. The rationale behind this hearsay exception is simple and well established throughout federal and state law: statements made to a health care worker are intrinsically reliable, as “only a foolish person would lie to his or her own doctor when seeking medical help.” (Ortega, 15 NY3d at 621 [Smith, J., concurring], citing Davidson v Cornell, 132 NY 228 [1892].)
In Matter of Dolan (Joan W.) (35 Misc 3d 781 [Sup Ct, Nassau County 2012]), the trial court admitted third-party statements contained within a patient’s medical records as “relevant to his treatment, and could he used to develop a discharge plan that would ensure his safety.” (Id. at 784, quoting Matter of Anthony H. [Karpati], 82 AD3d 1240, 1241 [2d Dept 2011].) In that case, the statements included those made by (1) the patient’s son, (2) an outpatient program representative, and (3) the patient’s caseworker outside of the hospital. (Dolan, 35 Misc 3d at 784.) Notably, both Dolan and Anthony H. were cases where the issue at hand was whether or not the patient was compliant with prescriptions and treatments at his AOT. In Dolan, the court relied on Anthony H., as well as the concurring opinion by Judge Smith in Ortega, noting that “when a patient has a mental health problem, it may often be true that almost any statement about his or her history will be within the hearsay exception.” (35 Misc 3d at 783, quoting Ortega, 15 NY3d at 622 [Smith, J., concurring].) Likewise, in Feinstein v Goebel (144 Misc 2d 462 [Sup Ct, Queens County 1989]), the court ruled in a civil action that statements made by a patient’s son were admissible under the exception, holding that the son was under a duty to relate truthful information in order to insure the appropriate treatment for his parent. The court found that “[t]he trustworthiness of the son’s statements to the house doctor are [sic] unquestionable,” following the logic of Williams v Alexander’s holding that statements which are “helpful to an understanding of the medical or surgical aspects of [the hospitalization]” should be admitted. (Id. at 465-466; see also 20-22 Prince LLC v Tsue Kwai Yen, 32 Misc 3d 1224[A], 2011 NY Slip Op 51414[U] [Civ Ct, NY County 2011] [third-party declarations admissible as germane to medical treatment].)
I agree with the holdings in Dolan, Feinstein, and 20-22 Prince LLC: statements made by a third person providing health-related information for the purpose of treatment are intrinsically reliable for purposes of this hearsay exception. This is true whether the declarant is a family member, an acquaintance, a *523 caseworker, another treatment provider, or even a person on the street who might have observed something relevant to a patient’s condition, so long as the statement is made directly to a medical provider in response to questions about the patient’s condition. For example, if a stranger observed a person running naked through the street screaming about aliens, the stranger’s description to a responding health care worker would be extremely pertinent to the diagnosis and treatment of that person. Of course, it can always be argued that a particular declarant might have a motive to fabricate a statement, even one made to a medical provider. For example, in the case at bar, one might suggest that Ms. H.’s statements about domestic violence — described at various points in Mr. M.’s treatment records — are fabricated or exaggerated in order to advance her own agenda. Indeed, statements made to the police, rather than to a treatment provider, may be more inherently suspect and anyway are not targeted towards medical treatment. But the statements made about Mr. M.’s mental health condition, made directly to a health care provider, are unlikely to serve any such ulterior motive. In any event, whenever business or medical records are entered into evidence pursuant to a hearsay exception, parties are free to argue that the statements within those records, or portions of them, are not reliable or probative for any number of reasons. This goes to the weight of that evidence, however, not to its admissibility.
In the instant matter, I find that statements made by Ms. H. and Mr. M.’s mother directly to the hospital, about his mental health status, in response to questions about his mental health are admissible as germane to his medical and mental health treatment. Likewise, I find that statements made by representatives of Mr. M.’s AOT, made directly to the hospital in response to questions about Mr. M.’s mental health status, are admissible.
However, other statements in the records — those made through additional parties and those that relate to allegations of domestic violence — are not admissible and have not been considered in reaching a finding. For example, the triage notes describing what Ms. H. told a police officer are hearsay, as the police officer is not a medical or mental health professional. And statements alleging domestic violence are not pertinent to Mr. M. ’s medical or mental health treatment. Unless those statements fall under some other hearsay exception — e.g. excited utterances, present sense impressions, etc. — they cannot be *524 considered for their truth, and no such foundation was offered in this case.
Finally, I note that even if all of these third-party statements in the records were not admitted or considered in my decision, the totality of the other evidence presented at the fact-finding still proves by a preponderance of the evidence the allegations of neglect by the respondent’s significant mental illness and failure to comply with his prescribed treatment.
Under Family Court Act § 1012 (f) (i) (B), persistent, untreated mental illness in a respondent can be the basis of a neglect finding. However, mental illness itself, standing alone, will not support such a finding unless there is a causal connection between the respondent’s condition and some actual or potential harm to the child. But as noted above, a finding of neglect does not require actual injury but, rather, an imminent threat that such injury or impairment may result. (.Matter of Aiden L., 47 AD3d 1089, 1090 [3d Dept 2008].) Here, the evidence established that Mr. M. struggled with severe mental illness for a period of years, requiring repeated hospitalization, medication, physical restraints, and close monitoring. Moreover, the Family Court in Kings County already found his history to constitute neglect of these children. Mr. M.’s ongoing lack of awareness of his condition and his need for treatment and medication maintenance, in combination with his anger issues and commission of acts of domestic violence on the children’s mother in front of them, constitute an imminent threat to the well-being and safety of the subject children. (See Matter of Jonathan S. [Ismelda S.], 79 AD3d 539 [1st Dept 2010] [severe mental illness and domestic violence supported a finding of neglect].) Expert testimony about the possible effects of such behaviors is not required (id.), and here it is plain that the children and family were endangered by Mr. M. in this way.
C. Educational Neglect and Marijuana Use
As for the allegations in the petition of educational neglect, no evidence of any kind was presented on this topic at the fact-finding. And while the medical records describe admissions by Mr. M. about his use of marijuana, there was no evidence presented about whether this had any effect on his children or family situation. (See e.g. Matter of Nassau County Dept. of Social Servs., v Denise J., 87 NY2d 73 [1995] [mere drug use is not neglect absent a link to an impairment of the respondent and an imminent danger to the subject child]; Matter of Jarrod G., Jr. [Jarrod G., Sr.], 73 AD3d 503 [1st Dept 2010] [no neglect *525 without causal link between drug use and impairment of respondent and danger to child]; Matter of Devin N., 62 AD3d 631 [1st Dept 2009] [same].) Accordingly, these allegations are not proved and are dismissed.
III. Conclusion
As described above, I find that the respondent, Gene M., neglected the five subject children through repeated domestic violence on their mother in front of the children, as well as having a significant mental illness and failing to participate or follow through with treatment and medication in a manner sufficient to be able to take care of the children.